IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA L. CHOVAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-194 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Debra L. Chovan and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of a final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

### II.   BACKGROUND

#### A.   Factual Background

Debra L. Chovan graduated from high school in Western Pennsylvania and completed one year of training as a cosmetologist before she moved to New Mexico, then to Colorado, with her husband. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 4, "Tr.," at 109.)  While in Colorado, she worked as a blackjack dealer at a casino for more

than ten years. During that time, she also had three children.

On April 8, 2004, Plaintiff quit her job, later stating that she had done so because she felt "depressed, stressed out,. . . [and] overwhelmed." (Tr. 58.) Plaintiff and her family moved back to Pennsylvania where her husband took a new job, but was let go in November 2004. (Tr. 99; 87.) Ms. Chovan reported that her husband's lack of employment, alcohol abuse and verbal abuse directed toward her at that time caused their marriage to deteriorate significantly. (Tr. 99.)

In mid-May 2005, Ms. Chovan began seeing Mary E. Griffin, Ph.D., a psychologist in Latrobe, Pennsylvania. (Tr. 97-103.) On May 23, 2005, Plaintiff voluntarily entered the behavioral health unit at Monongahela Valley Hospital after her husband threatened to have her involuntarily committed because she was a danger to herself and/or others. (Tr. 84.) When she was released five days later, against medical advice, her diagnosis was bi-polar disorder[1]

---

[1] Bipolar disorder is a mental condition resulting from disturbances in the areas of the brain that regulate mood; it is characterized by periods of excitability (mania) alternating with periods of depression. During manic periods, the person may be overly impulsive and energetic, with an exaggerated sense of self. The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts. The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state. There is a high risk of suicide with bipolar disorder. *See* the medical encyclopedia at the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/medlineplus (last visited August 3, 2007), "Medline Plus."

and her Global Assessment of Functioning was 35-37.[2]   (Tr. 72.)
After her release, she met with Dr. Griffin on three more
occasions, then began treating with therapists and psychiatrists at
Southwestern Pennsylvania Human Services, Inc. ("SPHS"), in
Charleroi, Pennsylvania.   (Tr. 101-103; 104-121; 138-151.)

At approximately the same time, Ms. Chovan received a
protection from abuse ("PFA") order against her husband, claiming
he was sexually molesting their children, and he was able to get a
similar order against her for mental instability evidenced by
public intoxication and nudity, as well as what he claimed were the
unfounded molestation claims.   (Tr. 110; 119.) Sometime before
October 2005, her husband was able to have the order against him
dismissed and he returned to Colorado with the children; Ms. Chovan
moved into her parents' home.   She remained unemployed.

B.   Procedural Background

On July 25, 2005, Ms. Chovan protectively filed for
disability insurance benefits, alleging disability as of April 8,

_____

[2]   The Global Assessment of Functioning or "GAF scale" assesses
how well an individual can function according to psychological,
social, and occupational parameters, with the lowest scores assigned
to individuals who are unable care for themselves.   Drejka v.
Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del.
Apr. 18, 2002). A GAF rating between 31 and 40 reflects "some
impairment in reality testing or communication (e.g., speech is at
times illogical, obscure or irrelevant) OR major impairment in several
areas such as work. . ., family relations, judgment, thinking, or
mood." See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS ("DSM-IV"), Multiaxial Assessment, American Psychiatric
Association (2002), at www.lexis.com., last visited August 3, 2007.
Neither Social Security regulations nor case law requires an ALJ to
determine a claimant's disability based solely on her GAF score.   See
Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561,
*33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

2004, due to bi-polar disorder, depression, anxiety and other mental problems. (Tr. 26.)  The Social Security Administration ("SSA") advised Ms. Chovan on October 4, 2005, that it had concluded she was not disabled because she could perform unskilled work such as a kitchen helper, commercial cleaner or laundry worker, even though her mental impairments precluded her from returning to her previous work.  (Tr. 24-29.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held before Judge Patricia C. Henry on July 25, 2006, where Plaintiff was represented by counsel.  Judge Henry issued her decision on August 8, 2006, again denying benefits.  (Tr. 8-17.)  On December 27, 2006, the Social Security Appeals Council advised Ms. Chovan that it had chosen not to review the ALJ's decision[3] (Tr. 4-6); therefore, the August 8, 2006 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed suit in this Court on February 16, 2007, seeking judicial review of the ALJ's decision.

## C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that

---

[3]   Usually, the next step in the administrative procedure would be for the Social Security Appeals Council to reconsider the ALJ's decision to determine if there had been an error of law or abuse of discretion on her part.  In selected test cases, however, this review step has been omitted.  See 20 C.F.R. § 404.966.

an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, id. at 401.  "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

5

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  ANALYSIS

### A.  The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I).

To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled

---

[4]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

6

prior to the date on which he was last insured.  42 U.S.C.
§ 423(a); 20 C.F.R. § 404.131(a).  The Commissioner does not
dispute that Ms. Chovan satisfied the first two non-medical
requirements, and the parties agree that Plaintiff's date last
insured will be December 31, 2009.  Therefore, in order to receive
DIB, Ms. Chovan must show that she became disabled prior to that
date.

In determining a claimant's rights to DIB,[5] the ALJ conducts
a formal five-step evaluation:

  (1)  if the claimant is working or doing substantial gainful
       activity, she cannot be considered disabled;

  (2)  if the claimant does not suffer from a severe impairment
       or combination of impairments that significantly limits
       her ability to do basic work activity, she is not
       disabled;

  (3)  if the claimant does suffer from a severe impairment
       which meets or equals criteria for an impairment listed
       in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the
       Listings") and the condition has lasted or is expected to
       last continually for at least twelve months, the claimant
       is considered disabled;

  (4)  if the claimant retains sufficient residual functional
       capacity ("RFC")[6] to perform her past relevant work, she
       is not disabled; and

---

[5]  The same test is used to determine disability for purposes of
receiving either DIB or supplemental security income benefits.  Burns
v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts
routinely consider case law developed under either type of benefits.

[6]  Briefly stated, residual functional capacity is the most a
claimant can do despite her recognized limitations.  Fargnoli v.
Halter, 247 F.3d 34, 40 (3d Cir. 2001).  Social Security Ruling 96-9
defines RFC as "the individual's maximum remaining ability to perform
work on a regular and continuing basis, i.e., 8 hours a day, for 5
days a week, or an equivalent work schedule."

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Henry first concluded that Ms. Chovan had not engaged in substantial gainful activity since she left her job as a casino dealer on April 8, 2004. (Tr. 11.) In resolving step two in Plaintiff's favor, the ALJ found that as of the date of the hearing, Ms. Chovan suffered from bipolar disorder and an anxiety disorder, both of which were "severe" impairments as that term is defined by the SSA.[8]   (Tr.

---

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[8] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

8

12.)  She also noted that Ms. Chovan did not claim to be disabled by physical impairments which would interfere with her ability to perform work at any level of exertion, including sedentary, light, medium or heavy work activity.  (Id.)

At step three, the ALJ concluded neither of Plaintiff's impairments, considered singly or in combination, satisfied the criteria in the relevant Listings, i.e., Listing 12.04 (affective disorders) or 12.06 (anxiety disorders.)  (Tr. 12-13.)

At step four, the ALJ concluded Ms. Chovan could work at all physical exertional levels, but that her mental impairments limited her to simple, repetitive, routine work which did not require a fast-paced production environment, involved only simple work-related decisions, and required relatively few work place changes and no more than occasional interaction with supervisors, co-workers, or the general public.  (Tr. 13.)  The vocational expert ("VE") who testified at the hearing, Ms. July Schollaert, identified Plaintiff's past work as a cosmetologist, waitress and casino card dealer as light work[9] performed at the semi-skilled to skilled level.  The ALJ concluded that because of her non-

---

[9]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b).  A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time.  Id.

exertional limitations, Plaintiff was restricted to unskilled job work and therefore could not return to those professions. However, the VE identified three jobs readily available in the local or national economies that Plaintiff could perform at the light, unskilled level, i.e., maid/housekeeper, parking attendant, and newspaper delivery person. (Tr. 22; *see also* Tr. 196.) Therefore, based on her status as a younger individual[10] with at least a high school education, a work history of skilled and semi-skilled occupations, her RFC, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. Chovan was not disabled and, consequently, not entitled to benefits. (Tr. 15.)

B. Medical Evidence; Analysis under Listings 12.04 and 12.06

Before considering the arguments raised by Plaintiff, contending that the ALJ committed numerous errors in her analysis, we briefly summarize the medical evidence of record and the specialized regulations an ALJ utilizes in considering Listings 12.04 and 12.06.

1. *Medical Evidence for the Period April 8, 2004, through July 25, 2006:* Plaintiff testified that she left her job as a blackjack dealer at a casino in Colorado in April 2004 not because of any particular event but because she was getting "pretty stressed." (Tr. 180.) However, there is no evidence in the record

---

[10] Plaintiff was 41 years old at the time of the hearing, meaning she fell within the category defined as a "younger individual," i.e., less than age 50. 20 C.F.R. § 404.1563(c).

that she sought treatment for stress or any other type of mental impairment until May 2005, more than a year later.[11] As noted above, Ms. Chovan began consulting with Dr. Mary Griffin on May 12, 2005. Dr. Griffin's notes cover only a six-week period and shed little or no light on Plaintiff's mental condition at the time.

Plaintiff began treating with SPHS on June 2, 2005, shortly after her release from Monongahela Hospital. (Tr. 105.) At an intake interview, she was described as having no suicidal or homicidal ideation, difficulty making decisions, anhedonia, risk-taking behavior, increased pleasure seeking, paranoid thoughts or hallucinations. On the other hand, she did complain of depressed mood, irritability, agitation, decreased appetite, sleep disturbance, crying spells, low self-esteem, and racing thoughts. (Tr. 108-109.) Her conversation was described as guarded, hard to redirect, and preoccupied with why her husband would not go to marital counseling. (Tr. 112.) Her diagnosis at that time was psychotic disorder NOS, her psychosocial stressors were the PFA order and marital discord, and her GAF was 45.[12] (Tr. 114.)

Ms. Chovan continued to seek counseling from SPHS. A

---

[11] Moreover, there is some evidence that the Chovan family moved from Colorado to Pennsylvania in April 2004 (Tr. 109), which could cast doubt on Plaintiff's statement that she quit her job because of stress.

[12] Mental disorders are described using a five "axis" method. Axis I refers to the patient's clinical disorders which are the focus of psychiatric treatment; Axis II refers to personality or developmental disorders; Axis III to general medical conditions; Axis IV to psychosocial and environmental problems; and Axis V provides an assessment of the individual's level of functioning, often by using a GAF score. *See* on-line version of DSM-IV, Multiaxial Assessment.

11

therapist named Myra (last name illegible) met with Plaintiff on eight occasions between August 4, 2005, and May 27, 2006.  (Tr. 116; 139-146.)  Throughout that period, Plaintiff was most often described as having appropriate mood and affect, but occasionally as being anxious or having a flat affect.  There are also repeated references to Plaintiff's difficulty making decisions and lacking insight or judgment regarding her family problems.  (See, e.g., Tr. 146, 142, 139.)  On November 17, 2005, when Plaintiff stated she was "stressed over no job and no money," Myra raised the question of job opportunities "but [Plaintiff] could come up with a reason/excuse."  (Tr. 142.)  On January 21, 2006, the therapist again noted that she "continues to not work and does not know what she wants to do with her life."  (Tr. 141.)

On July 27, 2005, Ms. Chovan was seen by a therapist named Sharon McCloskey, M.Ed.[13]  In progress notes from that date, Plaintiff was described as pleasant, cooperative, alert and oriented as to time, place and person, able to maintain good eye contact, with clear, unpressured speech, and linear, goal-directed thought processes.  Her cognitive exam was significant for decreased concentration, her memory was fair, and her insight, judgment, and impulse control were described as poor.  Her GAF score on that date was 55.  (Tr. 119-120.)

---

[13]  Ms. Chovan did not keep a second appointment with Ms. McCloskey scheduled for August 4, 2005 (Tr. 121), but there may have been some confusion regarding that appointment since notes by an unidentified person appear in the record on that date.  (Tr. 117-118.)

The progress notes from November 9 and November 25, 2005, and March 8, 2006, were entered by Deborah Holman, R.N.  Ms. Holman noted on November 9, 2005, that Plaintiff reported depressed mood on "gloomy" days.  The nurse declined to recommend Xanax[14] for shortness of breath and heart palpitations because of its addictive qualities and Plaintiff agreed to continue her practice of exercising and using relaxation techniques to decrease anxiety instead.  Plaintiff described her depression as 7 out of 10 with 10 being the worst.  (Tr. 167-168.) On November 25, 2005, her self-report of depression was 7-8 out of 10 and her anxiety level was 3-4 out of 10.  She reported she felt "awful" because "the holidays are getting to me" and her mother wanted her to go back to her husband who was then in Colorado.  She "didn't know what to do" and was sleeping "a lot more than usual."  Plaintiff was advised to get public welfare and legal aid to help with her marital problems.  (Tr. 165-166.)  Finally, on March 8, 2006, Ms. Holman reported that Plaintiff had again requested Xanax because she was nervous and very depressed "fairly often."  Plaintiff reported continued emotional abuse by her husband during a one-month visit to his home in Colorado in December.  She also reported periods of "feeling high" when she purchased things she did not need using a credit card.  (Tr. 162-163.)

---

[14]  Xanax (alprazolam) is used to treat anxiety disorders, panic attacks, depression and agoraphobia.  It is in a class of medications called benzodiazepines which work by decreasing abnormal excitement in the brain.  See drugs and supplement definitions at Medline Plus.

13

Notes from two psychiatry sessions with an unidentified person also appear in the record.[15]   On August 4, 2005, Plaintiff denied suicidal thoughts, past attempts at suicide, or psychotic symptoms. She did report insomnia due to anxiety, severe depression, decreased concentration, crying spells, hopelessness, and lack of motivation.  She also reported episodic bursts of energy.  She was described as alert, cooperative and well oriented times 3, with depressed mood, labile affect, and occasional crying during the interview.  Her thought process was well organized and she was not delusional. (Tr. 117-118.)   In the notes of the second session on September 15, 2005, Plaintiff reported improved sleep, albeit with nightmares about her husband.  She was described as talkative, with depressed mood.   (Tr. 151.)

Dr. Oscar Urrea, a psychiatrist, performed medication checks on October 4, 2005, and January 9, 2006.  In the first report, he noted that in his judgment, Plaintiff's thoughts about her

---

[15]   There are two references in the notes of August 4, 2005, which imply they continue on the reverse of the page, but no continuation appears in the record.  It is the responsibility of the claimant to assure the records are complete.  Yuckert, 482 U.S. at 146, n.5 (the claimant is in a better position than the ALJ to provide information about her own medical condition); see also 20 C.F.R. § 404.1512(a). Although the notes from August are unsigned, the notes from September appear to be in the same handwriting but the signature is illegible. The Court concludes, however, that these were probably not written by Dr. Urrea because there is a statement that when Plaintiff was admitted to the hospital in May 2005, she "was told she has bipolar [disorder.]"   (Tr. 117.)   Since Dr. Urrea was the physician who diagnosed her at that time, this would seem to be an unusual way of referring to his own diagnosis.  Moreover, excluding Dr. Urrea as the source of these notes is consistent with his report of July 13, 2006, indicating that he provided psychiatric counseling only on October 4, 2005, and January 9, 2006.   (Tr. 153.)

14

husband's sexual abuse of their children "were found to be delusional." A form report indicated nothing unusual in her behavior, clear speech, modulated affect, anxious mood, delusional thought content, goal-directed thought, no suicidal or homicidal risks, intact perception, full orientation, adequate concentration, and intact memory, but below-average insight and judgment. Her GAF was reported as 55. (Tr. 169.) On January 9, 2006, Dr. Urrea reported exactly the same results in his mental status examination except that her insight and judgment were described as average. Her GAF score at that time was 40. (Tr. 164.)

Finally, Ms. Chovan was evaluated four times by a psychiatrist named Ravi Kolli. On October 15, 2005, he described Plaintiff as talkative and friendly, with "some elaborate stories" about her husband being manipulative and having "a criminal mind." She described nightmares and a concern that she was "losing touch with reality on occasions." She also reported elevated moods and depressed feelings. Her diagnosis was bipolar disorder with psychotic features. (Tr. 150.) On January 7, 2006, Ms. Chovan reported to Dr. Kolli that she had a difficult time with her husband during the holiday visit. She remained anxious and depressed "due to many situations that she is facing." She was "not presently [impaired in] her reality testing," and although not suicidal, she was "clearly not able to function."[16] Her diagnosis

---

[16] This portion of the doctor's notes is ambiguous because he writes "...she's not clearly not able to function" which would normally indicate that she was able to function. However, the Court

15

was a history of bipolar disorder with psychotic features in partial remission. (Tr. 149.) Dr. Kolli noted on March 4, 2006, that she reported feeling very sad and depressed about her still-unresolved family situation. She was not "able to focus on things and still feels depressed from time to time." She also reported mood swings but no psychotic symptoms or suicidal feelings. Dr. Kolli described Plaintiff as "fairly cooperative" and "rationale [sic] and cognitive in her thought process." Her sad feelings and depressed moods were "related to the loss of custody of her children which is realistic." Her diagnosis was mild depression with psychotic features in partial remission. He particularly noted that his plan for her continued treatment was to "encourage her to set some goals and get a job, etc." (Tr. 148.) On May 20, 2006, the psychiatrist noted that following another trip to Colorado, Plaintiff reported being "depressed due to stressors in her life." She showed no evidence of formal thought disturbance, although Dr. Kolli did comment that "she has some odd over valued beliefs systems [sic] but they don't seem to be of delusional nature," that is, she was "very logical about her beliefs." She had "some insight into her problems." Her diagnosis was a history of mood disorder. (Tr. 147.)

A non-examining consultant, Dr. Sanford Golin, provided an evaluation of Plaintiff's mental impairments based on a review of

---

has interpreted this statement in Plaintiff's favor as most likely an erroneous transcription.

her file through September 2005. (Tr. 122-137.) At the request of Plaintiff's counsel, Ms. Holman completed a mental impairment questionnaire and Dr. Urrea completed a physician's report in mid-July 2006. Those documents will be discussed below in the context of analyzing Plaintiff's arguments.

2.   *Analysis of Listings 12.04 and 12.06.*   The Social Security Administration has developed a special technique for reviewing mental disorder claims.   Listings 12.04, affective disorders, and 12.06, anxiety disorders, are similar in that each requires the ALJ to compare the severity and effects of the claimant's condition to what are referred to as the A, B, and C criteria.

To meet Listing 12.04 which addresses disorders "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," the claimant must satisfy one of three A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria.   The A criteria require the claimant to show the medically documented persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific characteristics;[17] manic syndrome with at least three of

_____

[17]   These characteristics include anhedonia (total loss of feeling of pleasure in acts that normally give pleasure); appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking.   Listing 12.04A.

17

eight characteristics;[18] or bipolar syndrome with both manic and depressive characteristics. To satisfy the B criteria, the claimant's mental impairment must be of such severity that it results in at least two of the following: marked[19] restrictions in activities of daily living ("ADLs"); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[20]   To satisfy the C criteria, the claimant must present medical evidence that her affective disorder has lasted at least two years, resulting in "more than a minimal limitation of ability to do basic work activities."   The symptoms or signs of the disorder must be currently attenuated by medication or psychosocial support.  The C criteria also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a

---

[18]  The characteristics of manic syndrome are hyperactivity; pressure of speech; flight of ideas; inflated self-esteem; decreased need for sleep; easy distractability; involvement in activities that have a high probability of painful consequences which are not recognized; or hallucinations, delusions or paranoid thinking. Listing 12.04A.

[19]  "Marked" is defined in the regulations as "more than moderate but less than extreme."  Listing 12.00C.  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id.  "Marked" is not defined by limitations on a specific number of different activities in each category but rather the "nature and overall degree of interference with function."  Id.

[20]  See further discussion of this criterion in Section C.2 below.

18

residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

Listing 12.06, anxiety disorders, requires the claimant to satisfy the one of the five A criteria plus two of the four B criteria or, alternatively, one of the A criteria plus the C criterion.   The A criteria are medically documented evidence showing the presence of (1) persistent anxiety accompanied by three out of four signs or symptoms;[21] (2) the persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid such stimuli; (3) recurrent severe panic attacks, occurring on the average of at least once a week; (4) recurrent obsessions or compulsions which are source of marked distress; or (5) recurrent and intrusive recollections of a traumatic experience which are a source of marked distress.   The B criteria are the same as in Listing 12.04 discussed above.   The C criterion is a complete inability to function independently outside the area of one's home.

---

[21]   The four signs or symptoms are motor tension, autonomic hyperactivity, apprehensive expectation or vigilance and scanning. Listing 12.06(A)(1)(a)-(d).

19

## C.   Plaintiff's Arguments

Ms. Chovan raises four arguments in support of her motion
for summary judgment.   First, she claims that the ALJ erred by
concluding her allegations of disability were not entirely
credible.   (Plaintiff's Brief in Support of Motion for Summary
Judgment, Docket No. 7, "Plf.'s Brief," at 8-13.)   Second, the ALJ
erred by failing to give controlling weight to Dr. Urrea's
opinions.   (Id. at 13-16.) Consequently, by failing to adopt that
opinion regarding the severity of her mental impairments, the ALJ
erred at step three in finding she did not satisfy Listing 12.04 or
12.06.   (Id. at 16-19.)   Finally, Judge Henry erred at step five of
her analysis by concluding Plaintiff retained sufficient RFC to
perform unskilled light work on a sustained basis.   (Id. at 19-21.)
We consider each of those arguments in turn.

1.   *The ALJ's credibility analysis.*   In her conclusions,
Judge Henry stated:

> The claimant's allegations of totally disabling non-
> exertional limitations, when considered in accordance
> with Social Security Regulation 404.1529 and Social
> Security Ruling[22] 96-7p, are not fully credible and not
> consistent with the clinical and objective findings, the
> claimant's self-reported activities of daily living, her
> overall testimony and the other evidence of record.

_____

[22]   "Social Security Rulings are agency rulings published 'under
the authority of the Commissioner of Social Security' and 'are binding
on all components of the Social Security Administration.'"   Sykes, 228
F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1).   "Rulings do not have
the force and effect of the law or regulations but are to be relied
upon as precedents in determining other cases where the facts are
basically the same."   Sykes, id., *quoting* Heckler v. Edwards, 465 U.S.
870, 873 n.3 (1984).

(Tr. 16.)

Plaintiff argues that this "single, conclusory statement" is "insufficient because the administrative record reflects that [her] statements concerning the intensity, duration and limiting effects of her symptoms were entirely credible. . . . [T]he ALJ erroneously discounted her subjective complaints where the record indicates no inconsistencies or embellishments [and] the ALJ mischaracterized the record in an effort to discount the severity of her symptoms." (Plf.'s Brief at 8.)

Judge Henry correctly noted that in determining a claimant's residual functional capacity, his or her testimony and subjective complaints must be taken into consideration. See Social Security Ruling ("SSR") 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." In most instances, a district court is required to give great deference to the credibility determination of an ALJ because the ALJ is best equipped to judge the claimant's demeanor and attitude. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), quoting SSR 96-7p. This Court must review the factual findings underlying the

ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted). However, because the ALJ is best able to judge a witness's truthfulness, this Court will reject an ALJ's credibility determination only if it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-47 (7th Cir. 2005).

Plaintiff argues that the activities she described to her doctors, in disability forms, and at the hearing "were fully consistent with her diagnosed depression, anxiety disorder and bi-polar disorder." (Plf.'s Brief at 8-9.) The Court does not disagree that her symptoms were fully consistent with her diagnoses; however, the issue is whether the symptoms were sufficiently severe as to preclude even unskilled work.

In a questionnaire about her activities of daily living dated August 21, 2005, Plaintiff stated she was able to clean her house, shop, prepare meals, drive a car, pay bills, had no difficulty going out in public or interacting with persons in authority, was able to participate in family events three or four times a year, could plan daily activities on "good" days when she did not feel "overwhelmed," and had no trouble understanding and carrying out instructions. She also reported that when she had been working, she had good attendance, was able to keep up with her work, could concentrate for extended periods of time, got along with her

22

supervisors and co-workers, and was able to accept workplace changes. On the other hand, she reported that at present, she was "feeling depressed, stress [sic] out, couldn't continue working, felt overwhelmed" [and] only prepared meals occasionally." She felt she needed help cleaning her home and preparing meals and expressed anger at her husband for being unemployed and for not helping her very much. She also reported a single episode when she had been arrested for disorderly conduct and public drunkenness in April 2005. She further noted she felt unable to complete projects at the time because she did not "have the concentration." Ms. Chovan stated that although she could make decisions on her own, it was "hard to make decisions and concentrate." (*See*, in general, ADL questionnaire at Tr. 58-63.)

At the hearing, when asked if she believed she was employable, her answer was vague and non-committal, i.e., "It's just I'm on my - I'm just not me right now. It's . . ." When asked to be more specific, she replied, "It's just my lack of concentration right now and just [the] period I'm going through." (Tr. 193-194.) In response to a follow-up question by her attorney, she reiterated that her concentration and ability to focus were "not good," yet she also testified that she was able to read, watch television, drive a car, shop by herself, do a variety of household chores, maintain her own checking account and pay her bills, and travel to and from Colorado to be with her family. (Tr. 185-188; 192-193.)

As noted above, although Plaintiff claimed she left her job in

23

April 2004 because she was "pretty stressed," she apparently sought no medical treatment until May 2005. Between June 2005 and June 2006 her therapy sessions tapered from bi-weekly to once-monthly intervals. She was evaluated by Dr. Urrea on only two occasions during that period and by Dr. Kolli only four times. Her medications were changed not because of difficulty establishing a therapeutic level or negative side effects, but because she had no insurance and was receiving medication through her psychiatrists. (Tr. 147.) She was able to travel (apparently independently) to and from Colorado on at least two occasions to spend time with her children, even though it meant returning to an abusive environment because of her husband. Her inability to make decisions was referred to in the medical records only in the context of decisions regarding her very difficult personal situation, not decisions about day-to-day activities. This evidence, taken cumulatively, contradicts Plaintiff's vague allegations that she was unable to work because of stress and an inability to concentrate or focus, and undermines the credibility of her statements regarding the severity of her condition.

In this portion of her brief, Plaintiff also contends that the ALJ paraphrased evidence in a way which was "not entirely accurate regarding the content or tone of the record" (Plf.'s Brief at 10), but she fails to give a single example such inaccuracies. To the contrary, the Court finds that Plaintiff has repeatedly misstated the record. For instance, she argues that the ALJ failed to

24

recognize that her daily activities were "sporadic and punctuated with rest and medication;" consequently, those activities should not be considered "easily transferable to the more grueling environment of the workplace, where it might be impossible to periodically rest or take her medication." (Id. at 9.) Having reviewed the entire record, the Court finds no reference to a need to interrupt her daily activities for rest or medication. In fact, according to Dr. Urrea's report of July 2006, her only medications were Geodon and Effexor XR[23] which she took twice a day and once daily, respectively. (Tr. 156). Neither is the Court able to identify any reports in her medical records or in her own questionnaire that she needed to take periodic breaks while performing activities of daily living.[24]

---

[23] Geodon (ziprasidone) is used to treat the symptoms of schizophrenia and episodes of mania or mixed episodes in patients with bipolar disorder. It is one of a class of medications called atypical antipsychotics which work by changing the activity of certain natural substances in the brain. In its extended release form, Effexor (venlafaxine) is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. Effexor is one of a class of medications called selective serotonin and norepinephrine re-uptake inhibitors which work by increasing the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance. See drugs and supplements at Medline Plus.

[24] The example in the text is only one of several inaccurate statements of the evidence. Plaintiff writes in her brief that "she had been having panic attacks since she was in her 20's." (Plf.'s Brief at 2.) The Court has only been able to pinpoint two references to panic attacks, the first in Dr. Griffin's notes that she had panic attacks when she was younger, i.e., in her 20s. (Tr. 99.) The second was at the hearing when Plaintiff explicitly stated that she had panic attacks when she was younger, but had not experienced them recently. (Tr. 185.) Plaintiff also argues that the ALJ did not point to affirmative evidence of malingering. (Plf.'s Brief at 12.) The ALJ did not mention or even imply that Plaintiff was malingering so it is

25

Plaintiff also argues that the ALJ's credibility determinations are clearly erroneous because the supporting evidence upon which she relies to discredit her testimony is irrelevant. (Plf.'s Brief at 10.) Once again, she provides no specific examples of the "irrelevant" evidence to which she refers. Social Security regulations require an ALJ to consider *all* relevant evidence of record when arriving at her conclusions regarding the severity of Plaintiff's disability. 20 C.F.R. § 404.1527(b). While it is true, as Plaintiff argues, that the ALJ may not conclude a claimant is able to work on a regular and continuing basis simply because she can perform routine activities on a sporadic basis (*see* Smith v. Califano, 637 F.2d 968, 971-972 (3d Cir. 1981)), there is no evidence in this case that her daily activities were performed only sporadically due to her mental impairments nor, conversely, that the ALJ relied only on reports of her daily activities to conclude she was not disabled.

Rather, we find that the ALJ correctly considered the medical evidence, together with Plaintiff's own self-reports and testimony at the hearing, to reach her decision regarding Plaintiff's credibility. The Court finds no error in the ALJ's credibility determination and declines to disturb that decision.

---

not surprising that she failed to state any affirmative evidence thereof. Third, Plaintiff refers to her testimony that her medications include Geodon, Effexor and Zyprexa. (Plf.'s Brief at 10, *citing* Tr. 182-183.) To the contrary, Plaintiff explicitly testified that she was not taking Zyprexa. (Tr. 183.)

2.   *The weight given to the opinions of Plaintiff's medical providers.*   Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Urrea, her long-term treating physician, by giving great weight to the opinion of a non-examining physician, and by discounting entirely the opinion of Ms. Holman.   While she concedes Dr. Urrea's opinion may not be supported directly by all the evidence, she contends "there is no other 'substantial evidence' in the case record that contradicts or conflicts with [his] opinion."   (Plf.'s Brief at 13.)   Relying on a recently issued Social Security Ruling, Plaintiff also argues that the ALJ should have given Ms. Holman's opinion greater weight in ascertaining her ability to perform substantial gainful activity, even though she is not an "acceptable medical source" as that term is defined by the SSA.   (Plf.'s Brief at 13-16.)

It is well-established that under the treating physician doctrine,[25] an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all."   Mason v. Shalala,

---

[25]   Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources.   A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source.   Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.   20 C.F.R. § 404.1502.

27

994 F.2d 1058, 1067 (3d Cir. 1993). Social Security regulations carefully set out the manner in which medical opinions are to be evaluated.  20 C.F.R. § 404.1527(d).  In general, every medical opinion received is considered.  Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Fargnoli v. Halter, 247 F.3d 40, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266, n.7.  The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

The regulations further provide that medical opinions from "acceptable medical sources"[26] are to be given weight according to

---

[26] *See* 20 C.F.R. § 404.1513(a), defining acceptable medical sources as licensed physicians, optometrists, and podiatrists;

28

the specific plan outlined above, but also recognize that evidence of a claimant's impairment may be provided by counselors, nurse-practitioners, physicians' assistants, early intervention team members, public and private social welfare agency personnel, and other non-medical sources, including, for example, "spouses, parents and other caregivers." 20 C.F.R. § 404.1513(d)(4).

As Plaintiff points out, on August 9, 2006, one day after Judge Henry issued her decision, the SSA published Ruling 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies." That Ruling re-enforced the policy of giving weight to medical opinions according to the hierarchy outlined just above, but also made an important policy change stemming from current medical practice in this country. That is,

[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. . . . The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that

---

licensed or certified psychologists; and qualified speech-language pathologists.

source's qualifications, the issue(s) that the opinion is
about, and many other factors. . . . Each case must be
adjudicated on its own merits based on a consideration of
the probative value of the opinions and a weighing of all
the evidence in that particular case.

SSR 06-3p.

The policy statement goes on to point out that while the
general rule for weighing medical opinions remains unchanged, in
some circumstances, the opinion of a medical source who is not an
"acceptable medical source" may outweigh even the opinion of a
treating source, particularly where the "non-acceptable" medical
source has seen the claimant more often than the treating source
and has provided better supporting evidence and a better
explanation for his or her opinion.  (Id.)

Plaintiff argues in this section of her brief that the ALJ
impermissibly gave greater weight to the opinion of a non-examining
consultant, Dr. Sanford Golin, than to the opinions of Dr. Urrea
and Ms. Holman. Dr. Golin completed a file review of Ms. Chovan's
medical records through September 29, 2005, first noting her
diagnosis of bipolar disorder. In considering the B criteria of
Listing 12.04, he concluded she had mild limitations in activities
of daily living and in maintaining concentration, persistence and
pace and moderate limitations in maintaining social functioning,
but that there was insufficient evidence regarding repeated
episodes of decompensation of extended duration. He further noted
that Ms. Chovan did not satisfy any of the C criteria.    In
considering her ability to perform work-related functions, he

30

found no more than mild limitations in most categories.  He did
conclude, however, that she would have  moderate limitations in her
ability to interact with the public, accept instructions and
criticism from supervisors, and interact with coworkers; moderate
limitations in the ability to respond appropriately to changes in
the work place; and marked limitations in her ability to set
realistic goals or make plans independently of others. His overall
conclusion was that Plaintiff would be able to meet the basic
mental demands of competitive work on a sustained basis despite
limitations from her impairments.  (See, generally, Tr. 122-137.)

In a "Physician's Report" dated July 13, 2006, Dr. Urrea noted
Ms. Chovan's diagnosis of bipolar disorder and his opinion that she
had made moderate progress but remained paranoid and suspicious.
Her prognosis was guarded due to poor insight and she would need
indefinite future care on a bi-monthly basis.  He concluded that
her disability was permanent and that at the current time, she
could not engage in regular, sustained, competitive, productive
employment.  (See generally, Tr. 152-154.)

As noted above, the only medical records from Dr. Urrea are
two "check-the-box" forms completed on October 4, 2005, and January
9, 2006.   (Tr. 169, 164.)   In those reports, there is no
explanation of how he arrived at the conclusions stated therein.
As the Third Circuit has noted, a report which requires the
physician "only to check boxes and briefly fill in blanks" is "weak
evidence at best," and where "these so-called reports are

unaccompanied by thorough written reports, their reliability is suspect." Mason, 994 F.2d at 1065; see also Dula v. Barnhart, No. 04-3176, 2005 U.S. App. LEXIS 7735, *7, n.1 (3d Cir. May 3, 2005), noting that nonetheless SSA regulations require the ALJ to consider such reports.  Moreover, we find the January 2006 report internally inconsistent in that it noted normal characteristics in all aspects of the mental status examination except anxious mood and delusions about her husband, yet designated her GAF as 40, a score which would generally indicate "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  We also find inconsistencies between the two reports themselves since when Dr. Urrea indicated below average insight and judgment in October 2005, he  assigned a GAF of 55 (indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning) while in January, when her insight and judgment were considered average, he assigned a much lower GAF score.  (Compare Tr. 169 and 164.)  Furthermore, there is no explanation of why he indicated in January 2006 that her insight was average yet stated in his July report that it was poor, nor why he recommended indefinite treatment at the rate of twice a month in his July report even though Ms. Chovan had been treated by psychiatrists only five times and talked with a therapist only four times during the six-month

32

period January through June 2006.[27]

Turning to Ms. Holman's report, a "Mental Impairment Questionnaire (Listings)" completed on July 12, 2006, we first note that there is no evidence in the record to indicate that she has any particular expertise in psychiatric nursing or counseling beyond her status as a registered nurse which would entitle her opinions to increased weight. Ms. Holman noted Ms. Chovan was "depressed over the separation from her immediate family," had become delusional, and did not process or respond to information normally. She indicated Plaintiff's impairments could result in absences from work more than three times a month and that she would have difficulty working on a sustained basis because "anxiety and decreased concentration would deter her from good performance." In evaluating the B criteria, Ms. Holman noted moderate restrictions in activities of daily living, marked difficulties in maintaining social functioning and in concentration, persistence and pace, and four or more episodes of decompensation each of extended duration. She concluded Plaintiff would have poor or no ability to make most occupational, performance or social adjustments, again due to slow thought processes, impaired judgment, poor decision making, delusions, emotional lability, and flight of ideas. (See,

_____

[27] Ms. Holman's report indicates that Ms. Chovan was seen by a psychiatrist only on January 9 and July 12, 2006, yet the record contains reports by Dr. Kolli dated January 7, March 4, and May 20, 2006. (Compare Tr. 155 to Tr. 147-149.) Conversely, she reports therapy sessions on March 1 and May 18, 2006, but no notes from those sessions appear in the record.

generally, Tr. 155-161.)

When Ms. Holman's opinions of July 2006 are compared to her notes from November 9, 2005, November 25, 2005, and March 8, 2006, we find little consistency between them. For instance, nothing in the notes supports Ms. Holman's highly restrictive conclusions about Plaintiff's ability to make work-related adjustments, other than a single reference to her slow responses and processing. Her opinions are inconsistent with those of Dr. Urrea, e.g., she notes flight of ideas, Dr. Urrea describes her thought processes as goal-directed; she describes Plaintiff's mood as depressed, Dr. Urrea notes anxious mood; she refers to Plaintiff's lack of concentration, Dr. Urrea considered her concentration adequate. Finally, there is nothing in the record to support Ms. Holman's finding that Plaintiff had experienced four or more episodes of decompensation. SSA regulations define "episodes of decompensation as "exacerbations or temporary increases in symptoms or signs [of the particular mental impairment] accompanied by a loss of adaptive functioning." The degree of exacerbation "would ordinarily require increased treatment or a less stressful situation" and "may be inferred from medical records showing significant alteration in medication or . . . of the need for a more structured psychological support system" for example, hospitalization. The term "repeated episodes of decompensation, each of extended duration" is defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Listing 12.00(C)(4).

34

The only possible event in Plaintiff's medical history which could satisfy any part of this standard is her hospitalization for five days in May 2005.  Consequently, we conclude Ms. Holman's opinion that Plaintiff experienced four such episodes during the period in question is either patently erroneous or reflects a lack of understanding of SSA regulations.

Finally, Plaintiff's argument that no other substantial evidence in the record contradicts or conflicts with the opinions of Dr. Urrea and Ms. Holman disregards the opinions of Dr. Kolli and Plaintiff's other therapists, Myra and Ms. McCloskey.  As discussed in detail above, although those medical sources also noted limited insight and judgment, as well as difficulty making decisions, nothing in their notes indicates that these signs and symptoms pertained to any aspect of Plaintiff's life other than her marital relationship.  Far from concluding that these limitations preclude Plaintiff from working, both Dr. Kolli and Myra encouraged her to do so.  (See, respectively, Tr. 148 and Tr. 142.)

"Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."  Fargnoli, 247 F.3d at 42; see also Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (where conflicting medical evidence is presented, "the ALJ may choose who to credit but 'cannot reject evidence for no reason or for the wrong reason," but must consider all the evidence and

35

explain the reason(s) for rejecting some portion of it.) Here, the ALJ discussed in detail the opinions of Drs. Urrea and Kolli, both of whom are specialists in psychiatry and both of whom treated Ms. Chovan for approximately the same period of time, as well as the opinions of Ms. Holman. While Judge Henry did not have the benefit of SSR 06-03p when writing her decision and thus simply stated that as a non-physician, Ms. Holman's opinion was "not entitled to deference" (Tr. 14), it is clear from the context that the ALJ considered her opinion at numerous points but gave it "minimal weight," not only because Ms. Holman was not an acceptable medical source, but because it was inconsistent with other substantial evidence of record.

The law is clear that this Court is not to re-weigh the evidence on appeal, but must determine if the record, as a whole, contains substantial evidence to support the ALJ's findings. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). Where such evidence exists and the ALJ has explained her reasoning, this Court may not reject those findings even if we would have made a different choice had we considered the matter de novo. See Claussen v. Chater, 950 F.Supp. 1287, 1292 (D. N.J. 1996)(although "reasonable minds can reach different conclusions following review of the evidentiary record upon which the Commissioner's decision is based, . . . . in such cases, a district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings"); see also

Thompson v. Barnhart, 382 F. Supp.2d 740, 747 (E.D. Pa. 2005), and Casanova v. Barnhart, CA No. 03-4081, 2004 U.S. Dist. LEXIS 2519, *5-*7 (E.D. Pa. Jan. 30, 2004) (finding no error in ALJ's decision to accept opinion of one treating source over another where the reasons for doing so were set forth in the decision.)   "When physicians draw different conclusions based on medical evidence, the ALJ must give greater weight to those physicians' opinions most consistent with the record as a whole." Odrick v. Barnhart, CA No. 02-8412, 2003 U.S. Dist. LEXIS 12093, *29 (E.D. Pa. July 11, 2003), citing 20 C.F.R. § 404.1527(d)(4).   Our review of the record and the ALJ's decision leads to the conclusion that the ALJ did not err in weighing the opinions of Plaintiff's treating physicians and giving greater weight to Dr. Kolli's opinion because it was more consistent with the details of Plaintiff's medical history, her activities of daily living, and her testimony at the hearing.   The Court finds that the ALJ had a more than adequate factual reason to give limited weight to Dr. Urrea's opinion that Ms. Chovan could not perform any type of work on a sustained basis.   Thus, this argument as the basis for Plaintiff's motion for summary judgment must fail.

      3.   *The ALJ's conclusion that Plaintiff did not satisfy Listing 12.04 or 12.06.* In her analysis at step three, Judge Henry found that Ms. Chovan's diagnoses of bipolar disorder and anxiety disorder satisfied the A criteria of Listings 12.04 and 12.06, respectively.   (Tr. 12.)   Briefly stated, the ALJ found that

Plaintiff's mental condition did not satisfy the B criteria of
either Listing for the following reasons:

> Ms. Chovan demonstrated no more than mild restrictions in
> her ADLs resulting from her psychological impairments, as
> reflected by her ability to care for her personal needs,
> watch television, read, drive short distances, use public
> transportation and perform a wide range of household
> chores. (Tr. 12, *citing* Plaintiff's ADLs questionnaire,
> Tr. 58-63, and testimony.)

> With regard to social functioning, the ALJ found moderate
> limitations based on the fact that there was no evidence
> of evictions, firings, or other legal difficulties due to
> maladaptive social behavior;[28] had no difficulty going
> out in public, e.g., to grocery shop and attend family
> gatherings; and had no difficulty interacting with other
> participants and engaged in no inappropriate behavior
> during the hearing. (Tr. 12.)

> As to concentration, persistence, and pace, Ms. Chovan
> demonstrated no more than moderate difficulties which did
> not preclude unskilled job tasks. Again, this conclusion
> was based on Plaintiff's testimony about her daily
> activities, her ADL questionnaire, Dr. Kolli's reports of
> March and May 2006 noting Plaintiff's cooperation,
> rational thought processes, and lack of formal thought
> disturbances, and Plaintiff's ability to respond
> appropriately to questions at the hearing without overt
> lapses in concentration. (Tr. 12.)

> She had not experienced repeated episodes of
> decompensation during the period at issue. To the
> contrary, during the period in question, she had required
> inpatient hospital confinement only on a single occasion
> in May 2005 when her husband threatened her with an
> involuntary commitment, and the medical records for the
> entire period fail to disclose any evidence of suicidal
> ideation, hallucinations or formal thought disorders.
> (Tr. 13.)

---

[28] Plaintiff "reluctantly admitted" that she was intoxicated when
arrested in April 2005. (Tr. 117.) Thus, the ALJ's conclusion that
her legal difficulties were not "due to maladaptive social behavior"
appears to be correct and Plaintiff does not question this particular
conclusion in her brief in support of the motion for summary judgment.

Judge Henry further concluded that Ms. Chovan did not satisfy any of the C criteria of Listings 12.04 or 12.06.   That is, the medical evidence showed only one hospitalization or other type of structured living condition during the period in question and Plaintiff had testified that she was able to care for herself independently. (Tr. 13.)

Plaintiff argues that not only do the ALJ's findings at step three fall "well below the minimal level of articulation required," but "the ALJ's own medical analysis is invalid because it is contrary to the totality of the medical evidence, especially from [her] treating sources."   (Plf.'s Brief at 17.)

At no point in her brief does Ms. Chovan argue that she satisfies the C criteria of either Listing.   She does claim. however, that she satisfies Listing 12.04, particularly identifying several of the signs and symptoms associated with depression and manic behavior, and satisfies Listing 12.06 as a result of generalized persistent anxiety.   (Plf.'s Brief at 19.)   This argument is supported by the medical record, but is irrelevant because those characteristics pertain to only the A criteria of the Listings, which the ALJ agreed had been satisfied.

Regarding the B criteria, Plaintiff argues that she has marked restrictions in maintaining social functioning and in maintaining concentration, persistence and pace, and has experienced four or more episodes of decompensation each of extended duration. (Plf.'s Brief at 19, *citing* Tr. 158.)   As discussed extensively above, the

only medical source who indicated limitations of this severity was Ms. Holman, whose opinions are not supported by the medical records of Plaintiff's psychiatrists.   In addition, as the ALJ noted, Plaintiff's activities of daily living are inconsistent with someone experiencing marked restrictions in social functioning and/or concentration, persistence or pace. Finally, Plaintiff argues that there is evidence of major impairment in work, judgment, thinking and mood, but she again fails to pinpoint such evidence in the record.   As noted above, the forms completed by Dr. Urrea and Ms. Holman in July 2006 (the only evidence which might support this argument) are inconsistent with their treatment notes which do not report severe impairments in these areas.

We conclude that contrary to Plaintiff's arguments, the ALJ satisfied the criteria of the cases upon which Ms. Chovan relies. That is, the ALJ first "set forth the reasons for [her] decision" rather than relying on a "bare conclusory statement that an impairment did not match, or [was] not equivalent to, a listed impairment."   Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004), citing Burnett v. Commissioner of SSA, 220 F.3d 112, 119-120 (3d Cir. 2000).   As further required by Burnett, the record was sufficiently developed and the ALJ considered the appropriate factors of each Listing vis-a-vis the entire body of evidence and explained her findings in detail, thereby allowing this Court to perform a "meaningful review" of her conclusions. See Jones, id. at 505.   Plaintiff's argument that the ALJ erred at step three by

concluding she did not satisfy Listing 12.04 or 12.06 must therefore be rejected.

4.  *The ALJ's RFC analysis.*  Ms. Chovan argues that when the cumulative effects of her impairments are considered, there are no existing jobs which she could reasonably be expected to perform. Because the ALJ ignored or improperly evaluated probative evidence, her assessment of Plaintiff's residual functional capacity was without foundation. (Plf.'s Brief at 19-20.)  Again relying on Ms. Holman's analysis, she contends that she cannot meet the mental activities requirements of competitive, remunerative, unskilled work, cannot maintain a routine or perform at a consistent pace, and would be absent from work more than three times a month.  By ignoring these limitations in posing her hypothetical question to the VE and by rejecting the responses to questions posed by Plaintiff's attorney which did incorporate them, the ALJ erred at step five of her analysis.  (Id. at 20-21.)

We need not consider this argument at length.  As noted above, the only objective evidence which supports such severe limitations in Ms. Chovan's ability to make work-related adjustments is Ms. Holman's unsubstantiated evaluation.  (*See* Tr. 159-161.)  At the hearing, the VE agreed with Plaintiff's attorney that someone who missed work more than three times a month or took naps on the job, was not able to function independently, was limited in her ability to interact with supervisors or co-workers, was unable to repeatedly use judgment and make decisions, and/or had limited

ability to maintain concentration and pace would not be able to work on a regular, sustained basis. (Tr. 197-200.) However, the record does not support such severe restrictions. An ALJ need not consider the answer to a hypothetical question as substantial evidence if the hypothetical question itself is without objective support. See Chrupcala v. Heckler, 829 F.2d 1269, 1271, 1276 (3d Cir. 1987) (an ALJ must include in his hypothetical questions all disabling factors supported by *objective* medical evidence) (emphasis added).

We conclude that the hypothetical question posed by the ALJ adequately incorporated all of Plaintiff's limitations supported by the medical record and thus she did not err in accepting the VE's opinion that there were numerous unskilled light jobs available in the local and national economies which Plaintiff could perform.

Having considered each of the arguments raised by Plaintiff in the brief in support of her motion for summary judgment, we find none of them persuasive and conclude that the ALJ's decision that Ms. Chovan was not disabled is based on substantial evidence. Plaintiff's motion for summary judgment in her favor is therefore denied. An appropriate Order follows.

August ___9___, 2007

_William L. Standish_
William L. Standish
United States District Judge

cc: Counsel of Record

42